# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### AUGUST 1999 SESSION

FILED

**October 28, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 02C01-9804-CR-00110 |
| | ) | |
| vs. | ) | Shelby County |
| | ) | |
| **JOYCE M. LINDSEY,** | ) | Hon. James C. Beasley, Jr., Judge |
| **a/k/a JOYCE WADE,** | ) | |
| | ) | |
| Appellant. | ) | (Second Degree Murder, |
| | ) | Aggravated Kidnapping, |
| | | Theft, Forgery) |

**FOR THE APPELLANT:**
**MARTI L. KAUFMAN**
**WILLIAM N. MONROE**
**CHRIS HAMILTON**
Attorneys at Law
5350 Poplar Ave., Ste. 102
Memphis, TN 38117

**FOR THE APPELLEE:**
**PAUL G. SUMMERS**
Attorney General & Reporter

**J. ROSS DYER**
Asst. Attorney General
425 Fifth Ave. North
2d Floor, Cordell Hull Bldg.
Nashville, TN  37243-0493

**WILLIAM L. GIBBONS**
District Attorney General

**THOMAS L. HENDERSON**
**JENNIFER S. NICHOLS**
Asst. District Attorney General
201 Poplar Ave., Third Fl.
Memphis, TN  38103

OPINION FILED:_____


**AFFIRMED**

**JAMES CURWOOD WITT, JR., JUDGE**

## OPINION

The defendant, Joyce M. Lindsey a/k/a Joyce Wade, appeals from the second degree murder, aggravated kidnapping, forgery and theft convictions she received at a jury trial in the Shelby County Criminal Court. The defendant is presently serving an effective 33-year sentence in the Department of Correction for her crimes. In her direct appeal, she raises these issues for our consideration:[1]

1. Whether the trial court properly denied the motion for judgment of acquittal on the second degree murder and aggravated kidnapping convictions.

2. Whether the trial court properly denied the defendant's motion for change of venue.

3. Whether the trial court properly admitted evidence of the defendant's hard feelings towards her sister as evidence of the defendant's motive.

4. Whether the trial court properly declined to give the defendant's proposed special jury instructions on DNA evidence and *corpus delicti*.

5. Whether the trial court properly imposed consecutive sentences.

Having reviewed the record, the briefs and oral arguments of the parties, and the applicable law, we affirm the judgment of the trial court.

The case before the court has been the subject of intense local interest in Shelby County and has received national media exposure on the television programs *Unsolved Mysteries* and *The Maury Povich Show*. It is a tragic case involving crimes against children and the division of a family against itself.

The state's evidence at trial established the following. The murder victim, Ashley Lashay Jones, was the defendant's four-year-old niece. The aggravated kidnapping victim, Erica Nicole "Niki" Manning, is the defendant's then twelve-year-old niece. The theft and forgery victim, Vicky Lee Morris, is the

---

[1]Our presentation of the issues employs different wording and order than that contained in the defendant's brief.

defendant's sister. Ms. Morris is the mother of the murder and kidnapping victims.

In September 1996, the defendant's life was in disarray. She was living in North Carolina, where she was in a troubled marriage. The defendant contacted her mother, who lived in Memphis, about going to Memphis to get her life together. Arrangements were made, and on Saturday, September 14, 1996, the defendant checked into a Memphis motel. The defendant called her sister Vicky Morris. The defendant was very intoxicated, and she did not want to see her sister until the following day. At the appointed hour that next day, Ms. Morris went to the motel. Ms. Morris found the defendant drunk and apparently pregnant. Ms. Morris inquired whether the defendant was pregnant, and the defendant affirmed that she was. The defendant agreed to come to the Morris home, where Vicky Morris lived with her husband, Carl Morris, and her children, four-year-old Ashley and twelve-year-old Niki.

When they arrived at the Morris home, Ms. Morris tried to sober up the defendant by giving her food and coffee. Later that evening, Niki and Ashley spent time getting to know their Aunt Joyce. This was the first time Ashley had ever seen her Aunt Joyce, and the little girl was instantly enamored of the defendant. The defendant made plans to take her nieces shopping the following day after Niki got home from school and obtained Ms. Morris' permission. The defendant also obtained permission for Ashley to stay home from her babysitter the following day so that she and the child could spend time together. Ms. Morris called the babysitter and informed her that Ashley would be staying home on Monday.

On the morning of Monday, September 16, Niki left for school. The Morrises left the house for work, and Ashley and the defendant were left alone in the Morris home. Around 9:00 or 9:30 a.m., Ms. Morris called home to check on the

3

defendant and Ashley, and the defendant told Ms. Morris about what Ashley had been doing. Ms. Morris thought she heard Ashley in the background. Following the Morrises' departure from home that morning and Ms. Morris' phone call, Ashley was never seen nor heard from again.

Around 3:15 p.m., Niki arrived home from school and found her Aunt Joyce under the influence of alcohol. When Niki inquired where her sister was, the defendant told her that the babysitter had picked up Ashley. Niki phoned a friend, but the defendant was anxious to leave the house and insisted that Niki finish her phone call quickly.

The defendant told Niki that they were going shopping. The pair went in the defendant's vehicle to a gas station, where the defendant used a pay telephone outside Niki's presence. The defendant phoned Ms. Morris and inquired whether she could cash a check at Ms. Morris' bank. Ms. Morris had another call and had to place the defendant on hold before the conversation was complete, and the defendant hung up before Ms. Morris was able to return to the call.

With Niki's assistance, the defendant located Ms. Morris' bank, but she was unable to cash the check she presented. According to Niki, the defendant tried to get money "out of my mother's bank account." The defendant tried to locate another bank, but she was unsuccessful.

Eventually, the defendant went to a gas station and made some calls on a pay phone. The defendant inquired of Niki whether Ms. Morris would be at home or at work at that time, which was around 4:30 p.m. When Niki told the defendant her mother would be at work, the defendant had Niki call the Morris home and leave a message that they were out shopping. The defendant also told Niki to

**4**

say that she was trying to talk the defendant into staying in a motel that evening, and the defendant would take Niki to school the following day.

After this phone call, the defendant and Niki began traveling toward Nashville. During this ride, as well as earlier in the afternoon, Niki observed her aunt drinking several bottles of Zima, an alcoholic beverage.

Near Dickson, the defendant's vehicle had a flat tire. An off-duty highway patrol officer stopped to offer assistance. The defendant told him she did not have a spare tire. The officer called a tow truck for the defendant. While they were waiting for the tow truck driver, Niki asked the defendant if she could call her mother, but the defendant told her no.

When the tow truck driver arrived, the defendant told him she did not have a spare tire. Therefore, the driver had to tow the defendant's car. While the driver was getting the defendant's car on the back of his truck, the defendant stood outside on the narrow shoulder of a bridge on Interstate 40 watching the driver. The driver found this unusual, as most women for whom he performs this service wait inside the cab of the truck.

Once inside the truck, the defendant and Niki told the tow truck driver a story concocted by the defendant that the two were mother and daughter and were escaping from an abusive home. One of the two showed the driver some photographs of the defendant with bruises and told him the defendant's husband had inflicted the injuries. This story apparently aroused sympathy in the tow truck driver, and he assisted the pair by taking them to a bank, where the defendant withdrew money with an ATM card, taking them to a fast food restaurant to purchase dinner, and finding them an inexpensive motel room for the evening

**5**

because all of the tire stores in Dickson were closed. Furthermore, the tow truck driver offered to bring the defendant a tire from his uncle's junk yard the next morning so that he would not have to charge her for towing her to a tire store.

At the motel, the defendant did not want to go inside to check in. She gave the money to the driver and asked him to do it for her. When he came outside and stood at the rear of the defendant's vehicle to get the licence plate number for the motel registration, the defendant got out of the truck and asked what the driver was doing. When the tow truck driver unloaded the defendant's car in the motel parking lot, the defendant watched the driver perform the task.

That night, Niki asked the defendant for permission to call Ms. Morris, but the defendant said, "No, just wait because we'll be back tomorrow." When it was time for bed, the defendant had Niki go outside to get a nightgown from the trunk of the defendant's car. The car was backed into a parking space outside the motel room door so that the trunk was facing the door. There were bags of clothes in the trunk of the car, and Niki did not look underneath them. The defendant stood in the doorway and told Niki in which bag to find the nightgown.

Shortly after 7:00 a.m. the next morning, the defendant paged the tow truck driver, who brought the junk yard tire and mounted it on the defendant's car. The defendant had the tow truck driver put the old tire in the back seat on top of some clothing, rather than in the trunk. The tow truck driver then went with the defendant and Niki to a tire store, where he spoke with the owner about an inexpensive tire. When the new tire was mounted, the defendant told the mechanic to put the old tire in the back seat, rather than in the truck. Before leaving the tire store, the defendant inquired about the location of a laundromat, and the tow truck driver pointed out one that was down the street.

6

The defendant and Niki began traveling toward Memphis. In Somerville, the defendant stopped at a discount store and purchased laundry soap, rubbing alcohol and two bottles of bleach. She took Niki to a laundromat and told her to wash the clothes from the back seat of the car. The defendant said she was going to wash the car and left Niki alone at the laundromat. The defendant left the laundry soap with Niki, but she took the bleach with her. About an hour later, the defendant returned to the laundromat, and Niki noticed that the car was not clean. When she asked about this, the defendant told her the line had been too long. The defendant washed some more clothes from the car. While the clothes were washing, the defendant began cleaning out the car. When the defendant opened the trunk, Niki noticed that there was no carpeting inside and there was an odor of bleach. The defendant told Niki she had accidentally knocked over the bleach. Niki also saw a spare tire in the trunk and asked her aunt why they had not used it when they had the flat tire. The defendant said she had forgotten about it. Niki and the defendant loaded all of the clothes back into the car and returned to Memphis.

When they reached the Morris residence at about 4:00 p.m., the defendant let Niki out but drove away. When Niki came in the house, Vicky and Carl Morris, who had by this time alerted the authorities that both Ashley and Niki were missing, inquired about Ashley. Niki reported what the defendant had told her, that Ashley had been picked up by the babysitter. Ms. Morris knew this could not be true, because either she or her husband transported Ashley to and from the babysitter each day. Ms. Morris instructed her husband to chase down the defendant, and Ms. Morris called 911.

Carl Morris was able to locate the defendant and bring her back to the house. A police officer arrived, and he observed the defendant make attempts to get to her car. Because emotions were high, the officer had to separate the

**7**

Morrises and Niki from the defendant by placing the defendant in the back seat of his patrol car. Later, the officer discovered a loaded .45 semi-automatic pistol which was cocked and in a locked position inside the defendant's purse, which had been inside the defendant's car. The defendant was arrested that evening for kidnapping Niki. The defendant's car was towed to a secure location that evening. The officer recalled having opened the trunk of the car and smelled a very strong bleach odor.

A subsequent search of the defendant's car revealed a box of checks which belonged to Ms. Morris, a check book belonging to Ms. Morris, a check written on Ms. Morris' account made payable to the defendant and bearing Ms. Morris' name in the signature field in the defendant's handwriting,[2] and Ms. Morris' class ring. More significantly, blood spatters were discovered in the trunk of the vehicle. Subsequent DNA testing of samples taken from the spatters was performed in conjunction with testing of samples of Ashley Jones's mother's and father's blood. According to the state's expert from the Tennessee Bureau of Investigation, the probability that the blood spatters came from a biological child of Ashley Jones's mother and father was 99.9 percent.[3] Ashley was the only child of Ms. Morris and Brian Jones, the father.

While the defendant was in pre-trial detention, she wrote letters to a male inmate. In a letter dated May 15, 1997, she wrote, "I just came from being charged with 2nd degree murder, there was a blood spots the size of a quarter where Ashley cut her fingers." In a letter dated June 25, 1997, the defendant wrote,

---

[2]In a statement to a detective of the Shelby County Sheriff's Department, the defendant said she had called Ms. Morris to see if she could write a check and sign Ms. Morris' name on it. The defendant admitted she and Niki went to the bank to cash the check, but the bank would not cooperate.

[3]Because Ashley Jones's body was never recovered, a direct sample of her blood was not available.

> You See the 4 year old & I went to the store & she cut her hand on Broken Glass behind my seat I took & wrap her hand in a Blanket Until it stop Bleeding & then put the Blanket in the trunk Ashley kept pushing the trunk Button in the glove Box & it was raining and storming Bad the Blanket Flapped against the trunk lid leaving Blood spot that you can't see with your eyes its microscopic. Because they could not find her & she was abducted Alan they charged me with murder.

In an undated letter, the defendant wrote, "The liner of my trunk (Rubber Seal) has Spots of blood on it. Can they charge me with murder without a body? I haven't murder Any one Ashley cut her hand on Glass in my car & she was swing her arms every which way."

At trial, Vicky Morris testified about a possible motive for the crimes. According to Ms. Morris, she was a single parent in the summer of 1989 when she was asked by the Department of Human Services to accept temporary custody of Tammy, the defendant's five or six-year-old daughter. Ms. Morris was promised financial assistance from DHS for Tammy, but she never received any. Because maintaining both Niki and Tammy and paying for their day care on her meager income was impossible, she surrendered Tammy back to DHS after about a month. Tammy was placed in a foster home, and eventually, her father was awarded custody through judicial proceedings. In February 1996, the defendant was in Memphis to transport her sister Teresa to Asheville, North Carolina. She and Ms. Morris saw each other, and the defendant was very cold to Ms. Morris. Two months later, in April 1996, the defendant told Ms. Morris during a phone conversation that her behavior in February had been occasioned by Ms. Morris having ruined her life by assisting Tammy's father in gaining custody of the child. The defendant became very emotional during this conversation. Ms. Morris tried to explain why she had surrendered temporary custody of Tammy back to DHS and that she had not assisted Tammy's father in pursuing custody. Finally, Ms. Morris testified that when Tammy was four, she bore a strong resemblance to Ashley at the same age.

In response to the state's proof, the defense offered the testimony of an expert in interpretation of DNA autoradiograms who challenged the state's DNA evidence. This expert conceded that DNA from the blood found in the defendant's trunk was consistent with the offspring of Ashley's mother and father; however, he opined that the probability of this DNA being consistent with "a lot of people" was much higher than was advanced by the state's expert. He opined the DNA pattern was found in one in forty unrelated people, and he opined that the frequency would be even greater among related individuals. Furthermore, he found other samples which the state contended were consistent with the offspring of Ashley's parents either inconclusive or too degraded for use.

With this evidence before it, the jury convicted the defendant of second degree murder of Ashley Jones, aggravated kidnapping of Niki Manning, theft of property under $500 for the personal checks belonging to Vicky Morris, and forgery for the check written on Vicky Morris' account that the defendant attempted to cash.

At a subsequent sentencing hearing, the trial court imposed a 24-year sentence for second degree murder, nine years for aggravated kidnapping, one year for forgery, and six months for theft. Finding the defendant a dangerous offender, the court imposed consecutive sentences for second degree murder and aggravated kidnapping, to be served concurrently to the theft and forgery sentences.

Following the trial court's denial of a motion for judgment of acquittal and motion for new trial, the defendant filed this appeal.

I

The defendant's first issue is whether the trial court should have granted her motion for judgment of acquittal on the second degree murder and aggravated kidnapping convictions. A motion for judgment of acquittal is a question of the sufficiency of the state's evidence of the defendant's guilt of the crime charged. State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). Accordingly, the standard for determining whether a motion for judgment of acquittal should be granted is analogous to the standard employed in reviewing the sufficiency of the convicting evidence after a conviction has been imposed. See State v. Jerry Burke, No. 02C01-9510-CR-00319, slip op. at 10-11 (Tenn. Crim. App., Jackson, Dec. 12, 1996), perm. app. denied (Tenn. 1997); State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). Thus, we employ the familiar sufficiency of the evidence standard in resolving this issue.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

Moreover, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237 (Tenn. 1973); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Lequire, 634 S.W.2d 608 (Tenn. Crim. App. 1987). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and

circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610 (1971); Jones, 901 S.W.2d at 396.   In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence.  Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956);  Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978).  On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.  Cabbage, 571 S.W.2d at 835.

**A.     Second Degree Murder**

As relevant to this case, second degree murder is "[a] knowing killing of another . . . ."  See Tenn. Code Ann. § 39-13-210(a)(1) (1997).

The defendant's contention on appeal is that the *corpus delicti* was not established beyond a reasonable doubt; therefore, the conviction cannot stand. *Corpus delicti*, meaning literally "the body of the crime," consists of two elements in a homicide case: (1) that there has been a death of a human being, and (2) that the

**12**

death was produced by criminal agency. <u>See, e.g.</u>, <u>State v. Shepherd</u>, 862 S.W.2d 557, 564 (Tenn. Crim. App. 1992). *Corpus delicti* must be established beyond a reasonable doubt. <u>Id</u>.

In her argument, the defendant makes numerous allegations which she says point to insufficiency of evidence of the *corpus delicti*. The heart of her complaint, however, relates to conviction in the absence of the victim's body. Recently, this court held in another second degree murder case, "The failure to recover a victim's body should not be fatal to the prosecution of a homicide. Requiring a body would afford absolute immunity to defendants who are cunning enough to destroy the body or otherwise conceal its identity." <u>State v. Kenneth Patterson (Pat) Bondurant</u>, No. 01C01-9501-CC-00023, slip op. at 15 (Tenn. Crim. App., Nashville, May 24, 1996), <u>perm. app. denied</u> (Tenn. 1996). Thus, the absence of a body, standing alone, is not fatal to the prosecution of this case. <u>See generally</u> Charles E. Torcia, 1 Wharton's Criminal Law (15th ed.1993) (note 36 and accompanying text).

We predicate our analysis of the evidence by reiterating that we review the evidence in the light most favorable to the state. Many of the specific challenges the defendant raises would require us to do otherwise. To be sure, the evidence in the light most favorable to the state demonstrates that four-year-old Ashley had been missing for approximately fourteen months at the time of trial. There had been extensive publicity of her disappearance and diligent police pursuit of all credible leads. The defendant had recently expressed her ill will towards her sister, the victim's mother, over a child custody order involving the defendant's daughter. On the day of Ashley's disappearance and the following day, the defendant behaved peculiarly. She told Niki that the babysitter picked up Ashley, but this proved false. Furthermore, the defendant, who had not met the babysitter

**13**

and was aware that the babysitter had been notified she would not be responsible for Ashley that day, did not call Ms. Morris when Ashley allegedly got into a vehicle on the street. The defendant was anxious to leave the Morris home when Niki arrived home from school. The defendant went to pay telephones, looked for banks, and drove east until she had a flat tire in Dickson, despite the fact she was supposed to be taking Niki shopping at a mall and K-Mart store near the Morris home in Shelby County. The defendant was evasive with Ms. Morris by having Niki leave a message on the home recorder, rather than calling Ms. Morris at work. She continued this evasiveness by taking Niki out of town overnight without permission, telling the people she encountered that she did not have a spare tire when there was one inside her trunk, and dropping Niki off at the Morris residence and driving away even though an explanation was owed to the Morrises about the overnight trip and Niki's absence from school that day. The defendant was very watchful of the tow truck driver, particularly when he was around the trunk of her car. She had the tow truck driver and the mechanic at the tire store place dirty tires on clothing in the back seat of the car, rather than in the trunk. When the defendant had Niki get a nightgown out of the trunk of the car, she watched the girl from a short distance and told her exactly where to look. Before returning to Memphis, the defendant went alone to clean her car and returned with it still dirty but the trunk smelling strongly of bleach and absent of its carpeting. Blood which was, in all reasonable probability, Ashley's was found spattered inside the trunk of the defendant's car. An expert in blood spatter interpretation opined that some of the stains in the trunk were inconsistent with the defendant's theory that they were made by a bloody blanket. One of the stains was consistent with a hair transfer pattern. Ashley's dolls were found in the passenger compartment of the defendant's car.

Furthermore, the record is devoid of any indication Ashley died by accidental means, self-inflicted injury or natural causes. See Shepherd, 902

**14**

S.W.2d at 901. The finger cut described in the defendant's letters to her jailhouse pen pal does not raise any reasonable suspicion of a fatal, accidental injury. No other evidence raises any suspicion of accidental injury. The mere absence of the four-year-old's body under these circumstances indicates foul play. Further, it is beyond belief that a four-year-old is capable of committing suicide. There is no indication whatsoever that Ashley was terminally ill; indeed, such would be exceedingly rare in a child of tender years.

All of this evidence leads to only one reasonable end, albeit unfortunate, that Ashley Jones is dead and that she met her death through the defendant's criminal act. Thus, the evidence sufficiently supports the defendant's conviction of second degree murder, and the trial court properly denied the motion for judgment of acquittal.

**B.     Aggravated Kidnapping**

Next, we examine the sufficiency of the aggravated kidnapping conviction. As relevant to the facts of this case, "[a]ggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed . . . [w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." Tenn. Code Ann. § 39-13-304(a)(5) (1997). False imprisonment is committed by one "who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (1997).

Once again, the defendant's argument in large part asks us to reweigh the evidence. As stated above, this we cannot do. The evidence in the light most favorable to the state proves that the defendant exceeded the scope of her supervisory authority over Niki Manning. Rather than taking Niki shopping for the afternoon at a nearby mall and K-Mart store, the defendant took Niki half-way

**15**

across the state on an overnight trip that lasted through the following day, when Niki should have been at school. The defendant induced the child to leave the Morris home with her by promising a shopping trip, and the defendant's status as "Aunt Joyce" concealed from the child that she was being taken from her home without her mother's and step-father's consent and for some other purpose than shopping. The defendant did not allow Niki to call home despite the child's repeated requests. Finally, the defendant had a gun in her purse during the ordeal.[4]

The evidence is sufficient to support a conviction of aggravated kidnapping. The fact that the child was deceived by her aunt does not remove criminal liability. Clearly, what Niki thought was an afternoon shopping trip turned into a long-distance flight of approximately 24 hours' duration. During this time, Niki was unable to call or return home. The defendant was in possession of a gun throughout the incident.

In finding the evidence sufficient to support the aggravated kidnapping conviction, we have considered and rejected the defendant's argument that she was unable to form the requisite knowing *mens rea* for false imprisonment, an element of the crime, due to her voluntary intoxication. See Tenn. Code Ann. § 39-11-503 (1997) (voluntary intoxication). There is evidence that the defendant consumed copious quantities of alcohol. However, there is also evidence that the defendant was able to present a forged check. She had the ability to deduce that she should have Niki leave a message at the Morris home that they might be out overnight,

_____

[4]The defendant spent a great deal of effort at trial attempting to question whether there was opportunity for the gun to have been placed inside the defendant's purse after the episode was over. However, a detective testified that Niki reported having seen the gun inside the defendant's purse when they were at the bank attempting to cash a check. Further, the defendant acknowledged to a detective that she had the gun with her before leaving North Carolina and coming to Memphis.

rather than calling Ms. Morris at work, which might result in resistance to the plan. The defendant was able to communicate with a highway patrol officer and a tow truck driver. She had the presence of mind to keep the tow truck driver from opening the trunk. She was able to concoct a scheme and instruct Niki in it so that they could gain the sympathy of the tow truck driver with their story of mother and daughter escaping an abusive home. Obviously, the jury rejected the defendant's claim that voluntary intoxication negated her ability to form the culpable mental state of the crime. This was its prerogative as the trier of fact.

The evidence sufficiently supports the defendant's convictions of second degree murder and aggravated kidnapping. The trial court did not err in denying the motion for judgment of acquittal.

## II

Next, we consider whether the trial court properly denied the defendant's motion for change of venue. The defendant claims she was deprived of a fair trial because of prejudicial pretrial publicity surrounding her case. It is beyond dispute that this case received a great deal of publicity. During *voir dire*, it was apparent that many of the prospective jurors were familiar with the facts of the case.

Initially, the defendant was not charged with the murder of Ashley Jones. Much of the publicity of which the defendant complained in her pretrial motion dealt with the pending charges for the kidnapping, theft and forgery and the ongoing investigation of Ashley's disappearance. Several newspaper articles appended to the motion for change of venue cast the shadow of suspicion upon the

17

defendant for Ashley's disappearance.[5] Prior to trial, the defense moved the court for a change of venue based primarily upon the unfair prejudice to the defendant in her kidnapping, theft and forgery cases from the suspicion that she was involved in Ashley's disappearance. The trial court denied the motion but indicated it would reconsider if there was difficulty selecting a jury. After the motion was heard, the defendant was charged with second degree murder, and she went to trial on the murder charge along with the other charges. At trial, the defense renewed the motion for change of venue after the jury was selected. The trial judge denied the motion, stating that although some of the jurors were familiar with the case, he was satisfied they could set aside their pre-trial knowledge and render an impartial verdict.

A change a venue may be granted "if it appears to the court that ,due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." Tenn. R. Crim. P. 21(a). In determining whether a change of venue should be granted, relevant factors include

1. Nature, extent, and timing of pretrial publicity.

2. Nature of publicity as fair or inflammatory.

3. The particular content of the publicity.

4. The degree to which the publicity complained of has permeated the area from which the venire is drawn.

5. The degree to which the publicity circulated outside the area from which the venire is drawn.

_____

[5]Not all of the articles are dated; however, those bearing dates are from September, October and November 1996, all a year or more before the trial. In the most egregious of these articles, an officer of the Sheriff's Department is quoted, "Joyce knows the circumstances of where that baby is and she just won't tell. She knows what happened." The other articles are more innocuous by comparison, stating that the defendant's vehicle was searched, identifying the defendant as a suspect, and reciting facts of the crimes from official records.

6.      The time elapsed from the release of the publicity until the trial.

7.      The degree of care exercised in the selection of the jury.

8.      The ease or difficultly in selecting the jury.

9.      The veniremen's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire.

10.     The defendant's utilization of his p[er]emptory challenges.

11.     The defendant's utilization of challenges for cause.

12.     The participation by police or by prosecution in the release of publicity.

13.     The severity of the offense charged.

14.     The absence or presence of threats, demonstrations or other hostility against the defendant.

15.     Size of the area from which the venire is drawn.

16.     Affidavits, hearsay or opinion testimony of witnesses.

17.     Nature of the verdict returned by the trial jury.

State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979). The mere exposure of jurors to pretrial publicity does not constitute constitutional error; indeed, "in this age of mass media it is quite likely that jurors may have had some level of pre-trial exposure to the facts and issues involved in a case." State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). Whether to allow a motion for change of venue is a matter left to the sound discretion of the trial court, whose decision will not be reversed on appeal absent a clear abuse of that discretion. See, e.g., State v. Vann, 976 S.W.2d 93, 114 (Tenn. 1998) (citation omitted), cert. denied — U.S. —, 119 S. Ct. 1467 (1999).

We have considered each of the Hoover factors with an eye toward the facts of this case. It is true that many of the prospective jurors, some of whom ultimately served as jurors, had been exposed to pretrial publicity. The publicity was generally unfavorable to the defendant, and unfortunately, a member of law

**19**

enforcement chose to make disparaging comments about the defendant which added to the media speculation about the defendant's guilt. There is reference in the record to media presence in the courtroom during the trial, indicating ongoing interest in the case. On the other hand, the parties and the court took great care in selecting the jury. Of the three prospective jurors whose comments the defendant specifically references in her brief, only one ultimately served on the jury. With respect to that juror, we view her comments, taken in their totality, as an unequivocal indication she could set aside the pretrial information she had received and consider the case solely on the evidence at trial.[6] Review of the *voir dire* reveals many prospective jurors with some knowledge of the case but few with strong prejudice against the defendant. The jury returned a verdict on a lesser offense on one of the charges – the defendant was charged with especially aggravated kidnapping, and the verdict was for aggravated kidnapping. This indicates the jury was not unduly inflamed by pretrial publicity; rather, it considered the evidence before it in reaching its verdict. The crimes and the trial took place in Shelby County, which this court judicially knows is the most populated metropolitan area of the state. As the district attorney pointed out during arguments on the motion to change venue, news of one crime in Shelby County is unfortunately quickly replaced with news of another. The defendant's complaint about the publicity at the time of the original hearing on the motion was that the defendant was being prejudiced by extensive media speculation about her involvement in Ashley Jones's disappearance, which was at that time an uncharged crime. By the time of trial, the defendant faced trial for Ashley's murder in addition to the other charges. The concern that the jury would unfairly convict the defendant of kidnapping, theft and forgery charges in order to punish her for her suspected role

---

[6]Moreover, we see no abuse of discretion in the trial court's refusal to excuse any of these three prospective jurors for cause. See State v. Burns, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979).

**20**

in Ashley's disappearance should have been lessened when the jury had the option of convicting the defendant for a crime directly related to Ashley's disappearance. On balance, we find no abuse of discretion in the trial court's denial of the motion for change of venue.

## III

The defendant's next issue concerns the admission of Vicky Morris' testimony about the defendant's hard feelings toward Ms. Morris because the father of the defendant's daughter was awarded custody of the child. The trial court limited the evidence to the basic facts of the defendant having behaved coldly toward Ms. Morris in February 1996, the phone conversation between Ms. Morris and the defendant in April 1996, and Ms. Morris' account of her brief tenure as Tammy's custodian and the subsequent judicial award of custody to Tammy's father in 1989. The trial court specifically ordered that any facts related to why the defendant lost custody of Tammy, such as evidence of the defendant's bad character as a mother, was not admissible. The court allowed evidence, however, that Tammy and Ashley resembled each other at the age of four.

On appeal, the defendant presents this issue as one cognizable under Rule 404(b) of the Tennessee Rules of Evidence, which pertains to character evidence through proof of other crimes, wrongs or acts. However, the trial court's order excluded proof in the nature of character evidence. Accordingly, we believe the issue is more properly viewed as a Rule 403 question of whether the danger of unfair prejudice from admission of this evidence outweighed its probative value. See Tenn. R. Evid. 403.

In reviewing a trial court's decision to admit or exclude evidence, an appellate court may disturb the lower court's ruling only if there has been an abuse

**21**

of discretion.  State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1980).

In this case, the defendant's recent actions and expressions of ill will toward her sister from a prior family-related incident were highly relevant to crimes committed by one family member against other members of the family.  The defendant's sister, Vicky Morris, is both the mother of the child victims and a victim herself of the theft.  "The motive and intent of the defendant in the commission of a murder are almost always critical issues."  State v. Gentry, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993).  The murder of Ashley Jones is the centerpiece of the defendant's criminal episode.  Four-year-old Ashley's resemblance to Tammy at the age of four was additional, relevant and probative evidence from which the jury could have inferred a motive for the crimes.  Although this evidence is prejudicial to the defendant in the sense that it points the finger of guilt at her, we fail to see that it is *unfairly* prejudicial.  See id. at 6 (defendant not entitled to exclusion of evidence merely because it is particularly damaging).  The trial court carefully limited the proof to exclude any evidence which might create unfair prejudice through proof of the defendant's prior bad acts which led to the defendant losing custody of her child.  The evidence was relevant, and its probative value far outweighed the danger of unfair prejudice.  It was properly admitted.

## IV

The defendant alleges the trial court improperly denied her request for special jury instructions on DNA evidence and *corpus delicti.*

"The Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law."  Tenn. Const. art. VI, § 9.  A criminal accused is entitled to a complete and correct charge of the law, State v. Teel, 793

S.W.2d 236, 249 (Tenn. 1990), including the law governing the issues raised by the evidence. State v. Zirkle, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995). A court commits no error by refusing a special charge if the instructions given impart a correct, full and fair statement of the applicable law. Id.

## A.    DNA Evidence

At trial the defendant urged the court to instruct the jury in accord with a concurring opinion from the Minnesota Supreme Court, in which three of the court's seven members opined

> At the very least, jurors should know:
> (1)    A given DNA profile may be shared by two or more people;
> (2)    The random match probability statistic is not the equivalent of a statistic that tells the jury the likelihood of whether the defendant committed the crime;
> (3)    The random match probability statistic is the likelihood that a random person in the population would match the characteristics that were found in the crime scene evidence and also in defendant's DNA;
> (4)    Where the known DNA sample from the defendant matches the unknown sample obtained from the crime scene, it does not necessarily mean the defendant is the source of the sample found at the crime scene; and
> (5)    That jurors alone have the final responsibility to decide the weight to be given to DNA random match probability statistics.

State v. Bloom, 516 N.W.2d 159, 171 (Minn. 1994) (*en banc*) (concurring opinion of Page, J., joined by Gardebring and Tomljanovich, JJ.). The trial court declined to give the instruction; however, the trial court did give the pattern instruction on expert testimony.

We believe the trial court gave a correct, full and fair statement of the law. Moreover, the defense ably challenged the state's DNA proof through intense, probing cross-examination of the state's expert and presentation of its own expert proof. The expert testimony elicited by the defense included evidence on the Bloom factors. Much of the special instruction concerns what are essentially matters of asserted scientific fact. As such, commentary in the form of a special instruction

**23**

would be constitutionally impermissible.  <u>See</u> Tenn. Const. art. VI, § 9.  The trial court's charge was proper.

**B.**   *Corpus Delicti*

The defendant also claims the trial court should have given a special instruction on *corpus delicti* because the case involves an entirely circumstantial homicide case in which no body was recovered.   The defendant's proposed instruction reads

> *Corpus delicti* must be proven beyond a reasonable doubt and *corpus del[i]cti* in a homicide case consists of competent proof of the death of a human being which was caused by a criminal act or agency of another.  In homicide cases it must be proven beyond a reasonable doubt that the death in question was not occasioned by natural causes, accident, or by the deceased in person.  Therefore, to find that the defendant, Joyce Lindsey, is guilty of homicide, you must find that the state has proven beyond a reasonable doubt that Ashley Jones is in fact dead, you must also find that Joyce Lindsey did some act that caused the death of Ashley Jones.  Finally, you must also find that the State has proven that the death of Ashley Jones was not occasioned by natural causes, accident, or some act of Ashley Jones herself.

Instead, the court charged

> The law presumes that the defendant is innocent of the charges against her.  You enter upon this investigation with the presumption that the defendant is not guilty of any crime and this presumption stands as a witness for her until it is rebutted and overturned by competent and credible proof.

> It is therefore incumbent upon the state, before you can convict the defendant, to establish, to your satisfaction, beyond a reasonable doubt the *corpus del[i]cti* or "body of the crime" that is:

> As to the Murder Charge:

> 1.   That Ashley Jones has been killed.

> 2.   That the defendant killed her, and that the killing was done in such a manner, by such means, and under such circumstances as would make her guilty under the law of one of the grades of felonious homicides heretofore defined and explained to you.

> 3.   The venue; that is that Ashley Jones was killed in Shelby

**24**

County, Tennessee before the finding of the indictment.

The defendant's primary complaint on appeal is that the court did not instruct the jury that it must find that Ashley's death was not the result of natural causes, accident or self-inflicted injury. See Shepherd, 902 S.W.2d at 901. Although this is a necessary prerequisite to a finding of guilt in a homicide case, see Davis v. State, 1 Tenn. Crim. App. 479, 483, 445 S.W.2d 933, 935 (1969), a conclusion that a defendant has, with a culpable *mens rea*, killed another is necessarily antithetical to the possibility that the victim's death was from natural causes, accident or suicide. In the present case, the jury was properly instructed on the definition of second degree murder and the lesser grade homicide offenses. By finding that the defendant knowingly killed the victim, logic required that the jury first eliminate the possibilities of natural death, accident or suicide. The additional instruction the defendant requested was surplusage. Accordingly, the charge the judge gave on *corpus delicti* was a correct, full and fair statement of the law. We find no error.

**V**

Finally, the defendant questions whether the trial court properly imposed consecutive sentences for the second degree murder and aggravated kidnapping convictions. When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. §40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the appellant." Id. In the event the record fails to demonstrate the

required consideration by the trial court, review of the sentence is purely *de novo*. Id. If appellate review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §40-35-210(a), (b) (1997); Tenn. Code Ann. §40-35-103(5) (1997); State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

Consecutive sentencing may be imposed in the discretion of the trial court upon a determination that one or more of the following criteria exist:

(1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior

**26**

indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (1997). In State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing of "dangerous offenders" -- the court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. See State v. David Keith Lane, --- S.W.2d ---, No. 03S01-9802-CC-00013, slip op. at 8-9 (Tenn. Knoxville, Sept. 27, 1999).

The trial court found that the defendant was a dangerous offender based upon the lack of regard for human life and high risk from the involvement of alcohol, particularly during the kidnapping episode when she was drinking and driving. The court did not explicitly rely upon Wilkerson, basing its decision instead upon State v. Woods, 814 S.W.2d 378 (Tenn. Crim. App. 1991), modified by State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995). Wilkerson represents a modification of the strict factual findings necessary for consecutive sentencing under Woods. See, e.g., State v. Moore, 942 S.W.2d 570, 573 (Tenn. Crim. App. 1996). The findings necessary for consecutive sentencing under Woods are essentially included within those necessary under Wilkerson. Compare Woods, 814 S.W.2d at 380 (court must find, inter alia, that "the circumstances surrounding the

27

commission of the offense are aggravated" and that "confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to 'lead a productive life and [his] resort to criminal activity in furtherance of [his] anti-societal lifestyle'") with Wilkerson, 905 S.W.2d at 937-38 (court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct). Thus, the trial court's Woods findings are a ready surrogate for the required Wilkerson findings.

With respect to the severity of the offenses, the court commented that the use of alcohol was involved in both the murder and the kidnapping, and the defendant had exhibited a lack of regard for human life by drinking and driving during the commission of the kidnapping. The court also relied upon Niki's young age and the impact of the kidnapping on her. With respect to the need to protect the public from further criminal conduct of the defendant, the court commented that it was impossible to know what was inside the defendant's mind in order to know with certainty whether or not "this is a one-time thing;" however, the defendant had murdered a child, gone to great lengths in disposing of the body, concealed the crime and kidnapped Niki. The court considered these facts indicative of the need to protect the public from further criminal activity. Upon *de novo* review, we agree. The facts found by the court support the imposition of consecutive sentences for second degree murder and aggravated kidnapping.

Finding no error requiring reversal, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

CONCUR:

_____
DAVID H. WELLES, JUDGE

_____
JERRY L. SMITH, JUDGE